THE PEOPLE, *ex rel.* The New York Inebriate Asylum, *vs.*
WILLIAM R. OSBORN.

The legislature may, in many ways, interfere with the actual administration of
the affairs of a corporation without destroying its corporate existence, or
impairing the powers of its managers or trustees.

Although, generally, where the property or effects of a corporation are seized
or sequestrated by virtue of statutes, in the exercise of the visitorial power,
the statutes themselves provide some mode of judicial proceeding for the
purpose, such a provision is not essential to the validity of the statute. On
the contrary, it is a well settled rule that where the legislature has the power
to provide redress for either a public or private wrong, the remedy, or mode
of redress, is wholly a subject of legislative discretion.

Where the real estate connected with an asylum belonged to the State, upon
which property there was a mortgage for $60,000 about to fall due, and no
funds applicable to the payment of it, except the funds in the hands of the
treasurer; and the legislature passed an act requiring the commissioners
of the land office to examine into the management of the asylum by the
superintendent and other officers of the institution, and take such action
(if any) to protect the interest and property of the State, in said asylum, as
they might deem necessary;

*Held,* 1. That the facts were sufficient to justify the commissioners in causing
the funds of the corporation to be secured and placed in the custody of a
person selected by themselves.

2. That the power vested in the commissioners was *quasi* judicial, and wholly
discretionary.

3. That such a discretion, except in a case of palpable abuse, was beyond judi-
cial control by the writ of *mandamus.*

4. That the only conceivable limit on the power vested in the commissioners
was that their action should be reasonable, and adapted to the object the
legislature intended, viz., the protection of the interest and property of the
State.

5. That the action of the commissioners, in assuming the control of the funds
of the corporation, and of its books, papers and vouchers, and in directing
the treasurer to hold them subject to their control and direction, was un-
objectionable, and was a good defense to an application for a *mandamus,*
commanding such treasurer to pay over the moneys, and to deliver the
books and papers, in his possession, to his successor in office.

APPEAL from an order granting a peremptory man-
damus.

By an act of the legislature of this State, passed April
15th, 1854, (*Laws of* 1854, *p.* 554,) it was provided that all

persons who should become stockholders pursuant to the act, should be constituted a body politic and corporate, by the name of "The United States Inebriate Asylum," which should continue for the period of fifty years, subject, however, to amendment, modification and repeal by the legislature, and have power to sue and be sued, and have a common seal. It should have power by its corporate name to purchase, hold and convey real estate in the city of New York, and erect thereon buildings suitable for such asylum, and for manufacturing and mercantile purposes connected with the institution. It should also have power to purchase, hold and convey such personal property necessary for such purposes, and no other. It was also provided that all the affairs and concerns of the said asylum should be conducted by twenty directors, annually elected by the stockholders from their number. The directors, from their number should elect a president and treasurer. The first board of directors were named in said act. It was also provided that at the dissolution of the institution, the asylum and the grounds attached thereto should be ceded to the State of New York, to be used for some benevolent institution.

By an act passed April 23, 1855, (*Laws of* 1855, *p.* 1097,) the aforesaid act was so amended as to empower the institution, by its corporate name, to lease buildings suitable for such asylum, and such other buildings as the institution might require. And that five of the board of directors should constitute a quorum for the transaction of business.

By an act passed March 27th, 1857, (*Laws of* 1857, *p.* 429,) the name of the institution was changed to the "New York State Inebriate Asylum," and the number of the board of trustees was increased to forty, and their aforesaid powers in all respects reënacted. A new board of trustees is named by this act, and constituted a commission to locate said asylum. The trustees were required to make an annual report. The act was to continue in

force for fifty years, subject to amendments and repeal.
By an act passed April 15th, 1859, (*Laws of* 1859, *p.* 902,)
the treasurer of each county in the State was required to
pay to the treasurer of the asylum, on the first Monday
of July in each year, ten per cent of all the moneys re-
ceived from the board of commissioners of excise. The
site of the asylum buildings, located by the trustees on
lands situated in Binghamton, Broome county, was, by
said act, confirmed. The trustees were required to ex-
pend said moneys in completing the asylum buildings,
commenced on said land, and such other buildings and
improvements as should be required for the comfort and
convenience of the patients. A new board of trustees was
named by this act. The senate, on recommendation of
the governor, was given the power to remove any trustee
of said Asylum, for cause to be specified.

By an act passed March 21, 1861, (*Laws of* 1861, *p.* 120,)
the trustees of said institution were authorized to issue
bonds to the amount of $60,000, the payment of which
was to be secured by a pledge of all the lands and build-
ings belonging to the said institution, to be payable in ten
years, and signed by the president and treasurer. All of
the moneys arising from a sale of the said bonds to be
expended in the building of the said asylum. On fail-
ure to pay said bonds at maturity, the holder was author-
ized to foreclose upon the lands of the institution, the
same as by virtue of a real estate mortgage. Such bonds
were issued, and became a lien on the real estate belong-
ing to the institution.

By an act passed April 25, 1867, (*Laws of* 1867, *p.* 1998,)
it was provided that certain portions of the license money
raised in the city and county of New York should be paid
to the said asylum, on condition that the said trustees
should, within sixty days after the passage of the act, by
deed convey to the State all the real estate, buildings and
improvements thereon and appurtenances thereto, owned

by the said asylum in the county of Broome, and the trustees were empowered to make such conveyance. The trustees duly made a conveyance of the said real estate to the State, on the — day of —, 1867, under and in pursuance of this act, thus placing the title to the real estate at once and absolutely in the State.

By section 3 of chapter 704, passed May 6th, 1870, it is provided that, "The commissioners of the land office are hereby required to examine into the management of the inebriate asylum at Binghamton by the superintendent and other officers of that institution, and to take such action (if any) to protect the interest and property of the State in said asylum as they may deem necessary, and report to the next legislature their action thereon."

At the time of the passage of this act the institution was in operation, and William R. Osborn, the defendant, was the treasurer of the said asylum. On the 1st day of June, 1870, Francis T. Newell was duly elected such treasurer, in the place of the said Osborn, and Osborn's term of office expired, at which time the said Osborn had in his hands, as such treasurer, moneys that he had received for such institution, the sum of $21,416.15. Said moneys were mainly from the excise funds from the different counties. The said Osborn, as such treasurer, also had the custody and possession of the books of account, papers and vouchers, &c., belonging to the asylum. Osborn refused to pay and deliver to the said Newell, his successor in office, the said moneys, books, papers and vouchers, &c. A motion was then made, at a special term, held in Delaware county, for a mandamus to compel him to pay the said moneys and deliver the said books, papers, vouchers, &c., over to his successor. He defended, on the ground that the commissioners of the land office, acting under the act of the legislature last aforesaid, had assumed control thereof, and directed and required him to hold them subject to their control and direction. The question thus

presented for consideration was, were the commissioners of the land office authorized by the said act to take such control and direction of the said moneys, books, papers, &c., and control them to the exclusion of the trustees and treasurer of the institution.

The court, at special term, was of the opinion that the commissioners had inadvertently exceeded their powers, and that the defendant was not justified in refusing to pay over the funds in his hands to the treasurer, his successor in office. And that neither was he justified in refusing to deliver the books, papers and vouchers, &c., of the institution to his successor in office. An order was therefore granted directing that a mandamus issue directed to the defendant requiring him to pay to Newell, treasurer of said company, the funds in his hands which he received as treasurer of said company, and to deliver over to him the books, papers, vouchers, &c., of the said company.

From this order the defendant appealed to the general term in the third department. It appearing that the judges were disqualified, the court, on its own motion, ordered that the same be sent to the second department, for argument.

*Henry R. Mygatt,* for the appellant and the commissioners of the land office.

*John N. Pomeroy,* for the asylum.

*By the Court,* GILBERT, J. This is an appeal from an order made at a special term, held in and for the county of Delaware, on the 11th day of August last, awarding a peremptory mandamus against the defendant, the former treasurer of the relator, commanding him forthwith to pay over to Francis T. Newell, his successor in office, the moneys in his hands, which he received as such former treasurer, and to deliver over to said Newell the books of

account and all papers and vouchers belonging to said relator, which he received as such former treasurer.

The appellant retains these effects of the relator pursuant to authority and directions given him by the commissioners of the land office, acting under an act of the legislature passed in 1870. This act is as follows: "The commissioners of the land office are hereby required to examine into the management of the inebriate asylum at Binghamton, by the superintendent and other officers of that institution, and to take such action (if any) to protect the interest and property of the State in said asylum as they may deem necessary, and to report to the next legislature their action thereon." (*Laws of* 1870, *ch.* 704, § 3.)

It was held by the court below, and conceded on this appeal, that the legislature had the power to pass an act empowering the commissioners of the land office to give to the appellant the authority and directions under which he justifies his acts, of which the relator complains; and such undoubtedly is the rule of law, whether we regard the relator as a private corporation, or as simply an instrumentality provided for the administration of a public charity. But it is urged that the act confers no such power; that it neither repeals nor modifies the statute incorporating the relator, and that therefore the exclusive power vested by such statute in the trustees of the corporation continues. It may be admitted that the act of 1870 did not have the effect to directly repeal or modify the charter of the relator, or any part thereof. It contains no repealing clause, and its provisions are not of a character to work a repeal by implication. But this is by no means decisive of the case.

The legislature may, in many ways, interfere with the actual administration of the affairs of a corporation, without destroying its corporate existence, or impairing the powers of its managers or trustees. Instances of the exercise by the legislature of this kind of visitorial power have

been numerous. The powers conferred upon the bank commissioners, by the safety fund act, and upon the comptroller, in relation to insurance companies, and upon the comptroller of the currency, by the act of congress relative to the national banks, occur to me as examples of the legislation to which I refer.

Generally, where the property or effects of a corporation are seized or sequestrated by virtue of statutes of this kind, the statutes themselves provide some mode of judicial proceeding for the purpose. Such a provision, however, is not essential to the validity of the statute. On the contrary, it is a well settled rule, that where the legislature have the power to provide redress for either a public or private wrong, the remedy or mode of redress is wholly a subject of legislative discretion. The sole question in the case then is, what is the meaning of the act of 1870 ? We think it is very plain. The commissioners are to do two things : 1st. They are to examine into the management of the asylum by the superintendent and other officers of the institution ; and, 2d. If they deem any action necessary to protect the interest and property of the State in such asylum, they are required to take such action. The only conceivable limit on the power vested in the commissioners to act is, that their action shall be reasonable and adapted to the accomplishment of the object the legislature intended, namely, the protection of the interest and property of the. State. We are of opinion that in both these respects the action of the commissioners was unobjectionable.

The learned justice, in the court below, held that the commissioners had, if they deemed it necessary, a right to control the funds, but that they must do it through and in the hands of the legally constituted treasurer of the company. We cannot consent to this view. It was competent for the commissioners to select a depositary of the funds. If they had selected the treasurer now in office he would,

The People *v.* Osborn.

*pro hac vice,* have been the agent of the commissioners, in the same sense that the appellant now is, and in respect to the funds which the commissioners sequestrated, he would not have any power or control by virtue of his office as treasurer of the corporation, but only the right to hold the same as a mere custodian under the direction of the commissioners. The commissioners, therefore, having the power to sequestrate the funds, it is quite immaterial whether they used the former or present treasurer for that purpose.

The papers show that the real estate connected with the asylum belongs to the State; that there is a mortgage for $60,000 upon it, which falls due May 1, 1871, and that there are no funds applicable to the payment of it, except the funds in the hands of the appellant. These facts are sufficient, certainly, to justify the acts of the commissioners in causing the funds of the corporation to be secured, and placed in the custody of a person selected by themselves; and it may be that a due protection of the State required the detention of the books and papers and vouchers also. We cannot say that it did not. The power vested in the commissioners is *quasi* judicial, and wholly discretionary. Such a discretion, except in a case of palpable abuse, is beyond judicial control by the writ of mandamus. No such abuse has been shown. We think there is nothing in the objection raised, that the act of 1870 violates the constitution. The law took effect upon its passage, and was in no sense dependent upon the action of the commissioners.

The order appealed from must be reversed, with costs.

[SECOND DEPARTMENT, GENERAL TERM, at Brooklyn, December 15, 1870. *J. F. Barnard,* P. J., and *Gilbert* and *Pratt,* Justices.]